# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Filed On: December 21, 2018

No. 17-7171

ARCHDIOCESE OF WASHINGTON, A CORPORATION SOLE,
APPELLANT

v.

WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY
AND PAUL J. WIEDEFELD, IN HIS OFFICIAL CAPACITY AS
GENERAL MANAGER OF THE WASHINGTON METROPOLITAN
AREA TRANSIT AUTHORITY,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:17-cv-02554)

———

On Petition for Rehearing En Banc

———

Before: Garland, *Chief Judge*; Henderson, Rogers, Tatel,
Griffith,* Srinivasan, Millett, Pillard, Wilkins, and Katsas,*
*Circuit Judges*

# **O R D E R**

Appellant's petition for rehearing en banc and the response thereto were circulated to the full court, and a vote was requested. Thereafter a majority of the judges eligible to participate did not vote in favor of the petition. Upon consideration of the foregoing, it is

**ORDERED** that the petition be denied.

## **Per Curiam**

**FOR THE COURT:**
Mark J. Langer, Clerk

BY: /s/
Ken Meadows
Deputy Clerk

\* Circuit Judges Griffith and Katsas would grant the petition.

A statement by Circuit Judge Griffith, with whom Circuit Judge Katsas joins, dissenting from the denial of rehearing en banc, is attached.

GRIFFITH, *Circuit Judge*, with whom *Circuit Judge* KATSAS joins, dissenting from the denial of rehearing en banc:

We ought to rehear this case en banc because the panel opinion conflicts with Supreme Court precedent on an issue of exceptional importance: the freedom to speak from a religious viewpoint. According to that precedent, the government in this case violated the First Amendment by prohibiting religious speakers from expressing religious viewpoints on topics that others were permitted to discuss.

The Washington Metropolitan Area Transit Authority (WMATA) is a governmental entity that operates the Metrobus public transportation system. During last year's Christmas season, the Roman Catholic Archdiocese of Washington, D.C., sought to run the following ad on the exterior of Metrobuses:



The proposed ad was part of the Archdiocese's "Find the Perfect Gift" campaign, whose purpose was "to share a simple message of hope, welcoming all to Christmas Mass or in joining in public service to help the most vulnerable in our community during the liturgical season of Advent." Decl. of Edward McFadden, Sec'y of Communications, Archdiocese of Wash., ¶ 3 (Nov. 27, 2017). The campaign "invite[d] the public to consider the spiritual meaning of Christmas, to consider celebrating Advent/Christmas by going to Mass at one of our parishes and/or joining in one of our many outreach programs that care for the most vulnerable and poor during Advent and

beyond." Decl. of Susan Timoney, Sec'y for Pastoral Ministry & Social Concerns, Archdiocese of Wash., ¶ 6 (Nov. 27, 2017). To that end, the proposed ad included the address for the campaign's website, which provided schedules for local Masses and described many opportunities for charitable service. *Archdiocese of Wash. v. WMATA*, 281 F. Supp. 3d 88, 97 (D.D.C. 2017).

WMATA rejected the ad, explaining to the Archdiocese that the ad violated a policy adopted by its Board of Directors prohibiting "[a]dvertisements that promote or oppose any religion, religious practice or belief." J.A. 115, 200. According to WMATA, the ad ran afoul of that ban "because it depicts a religious scene and thus seeks to promote religion." J.A. 115. During this litigation, WMATA further explained that its decision was based not on the ad alone, but also on the website referenced in the ad, which "contained substantial content promoting the Catholic Church," including "a link to 'Parish Resources,'" "a way to 'Order Holy Cards,'" and "videos and 'daily reflections' of a religious nature." Decl. of Lynn Bowersox, WMATA Assistant Gen. Manager for Customer Service, Communications & Marketing, ¶¶ 19-20 (Dec. 1, 2017).

When the Archdiocese challenged WMATA's decision, the district court upheld the decision, as did a panel of this court on appeal. *Archdiocese of Wash. v. WMATA*, 897 F.3d 314, 320-21, 335 (D.C. Cir. 2018).[1] The panel found that advertising space on a Metrobus is a non-public forum and held that

---

[1] Judge Rogers authored the panel opinion, which Judge Wilkins joined. Then-Judge Kavanaugh was a member of the panel when the case was argued, but he did not participate in the opinion owing to his nomination to the Supreme Court. *See Archdiocese*, 897 F.3d at 318, 335.

WMATA's policy was permissible under the First Amendment. *Id.* at 322-23, 335.

Supreme Court precedent, however, instructs otherwise. In interpreting the First Amendment, the Court has long held that the government may place reasonable restrictions on the *subjects* discussed in a non-public forum, but the government may not impose restrictions based on a speaker's *viewpoint*. *See Minnesota Voters All. v. Mansky*, 138 S. Ct. 1876, 1885 (2018); *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 806 (1985). In the context of religious speech, the Supreme Court has three times considered restrictions indistinguishable from the WMATA policy challenged here. In all three cases, the government argued, as WMATA does here, that the restrictions were permissible because they prohibited all views on a discrete subject: religion. In all three cases, the Supreme Court rejected that argument because the restrictions did more than attempt to ban the discussion of religion; they also barred the expression of religious viewpoints on topics that were otherwise permitted to be discussed. This case is no different, for WMATA's policy barred the Archdiocese from speaking from a religious viewpoint on subjects others were permitted to discuss, such as charitable giving and how best to spend one's time and money during the Christmas holiday.

In *Rosenberger v. Rector & Visitors of the University of Virginia*, the University of Virginia funded all sorts of extracurricular activities for students, but not the publication of a Christian magazine. 515 U.S. 819, 825-26 (1995). Such funding was prohibited by a university policy that excluded "religious activities," defined as any activity that "primarily promotes or manifests a particular belie[f] in or about a deity or an ultimate reality," which the University and the Supreme Court understood to bar not only speech that promoted religion but also speech that opposed religion. *Id.* at 825, 836-37. The

University argued that a policy that excluded all discussion of religion was a permissible restriction in a non-public forum. *Id.* at 830-31. But the Court found that the policy's "very terms" did not simply "exclude religion as a subject matter." *Id.* at 831. Instead, the policy barred religious views on otherwise-permissible subjects. *Id.*

To be sure, much of the magazine's content was religious. According to the magazine's mission statement, its purpose was "to challenge Christians to live, in word and deed, according to the faith they proclaim and to encourage students to consider what a personal relationship with Jesus Christ means." *Id.* at 826. And the magazine published articles on such religious topics as prayer, sacred music, Christian missionary work, and the devotional writings of C.S. Lewis. *Id.* But importantly, the magazine also published commentary from a religious viewpoint on topics such as racism, and it was the restriction of such expression that violated the First Amendment. "Religion," the Court explained, provides "a specific premise, a perspective, a standpoint from which a variety of subjects may be discussed and considered." *Id.* at 831. "If the topic of debate is, for example, racism, then exclusion of several views on that problem is just as offensive to the First Amendment as exclusion of only one. It is as objectionable to exclude both a theistic and an atheistic perspective on the debate as it is to exclude one, the other, or yet another political, economic, or social viewpoint." *Id.*

In two other cases, the Supreme Court likewise rejected governmental decisions that barred religious expression much like WMATA's policy does. In *Lamb's Chapel v. Center Moriches Union Free School District*, the Center Moriches, New York, school district made school facilities available for after-hours public use, specifically "social, civic, or recreational uses" and certain "use[s] by political

organizations," but banned use "by any group for religious purposes." 508 U.S. 384, 387 (1993). Relying on this ban, the school district refused to permit Lamb's Chapel, an evangelical church, to use school facilities to show a film series by Dr. James Dobson on instilling "traditional, Christian family values" in one's children. *Id.* at 388. According to a unanimous Supreme Court, the school district's decision was impermissible viewpoint discrimination because the proposed film series "dealt with a subject otherwise permissible" in the forum: family issues and child rearing. *Id.* at 393-94; *see id.* at 397 (Kennedy, J., concurring in part); *id.* (Scalia & Thomas, JJ., concurring in the judgment). Even though the ban treated "all religions and all uses for religious purposes . . . alike" by excluding all of them, the "critical" point remained that "it discriminates on the basis of viewpoint to permit school property to be used for the presentation of all views about family issues and child rearing except those dealing with the subject matter from a religious standpoint." *Id.* at 393.

A similar ban led to *Good News Club v. Milford Central School*, 533 U.S. 98 (2001). There, the Milford, New York, school district opened school facilities for after-hours public use, including for "social, civic and recreational meetings," but banned use "by any individual or organization for religious purposes." *Id.* at 102-03. Accordingly, the school district refused to allow the Good News Club, a local Christian organization for children, to use school facilities for meetings where the children would pray, memorize scripture verses, learn Bible lessons, and "cultivate their relationship with God through Jesus Christ." *Id.* at 103, 111. In the words of the school district, the Club's activities were "the equivalent of religious worship" and "the equivalent of religious instruction." *Id.* at 103. Despite the undeniable religious nature of these activities, the Supreme Court held that applying the ban to the Club was viewpoint discrimination because the Club

also sought to address an otherwise-permissible subject—the teaching of morals and character—from a religious standpoint. *Id.* at 108-09. The Court explained, "[R]eligion is used by the Club in the same fashion that it was used by Lamb's Chapel and by the students in *Rosenberger*: Religion is the *viewpoint* from which ideas are conveyed." *Id.* at 112 n.4 (emphasis added). "We did not find the *Rosenberger* students' attempt to cultivate a personal relationship with Christ to bar their claim that religion was a viewpoint. And we see no reason to treat the Club's use of religion as something other than a viewpoint merely because of any evangelical message it conveys." *Id.*

WMATA's policy against religious ads is indistinguishable from the restrictions in *Rosenberger*, *Lamb's Chapel*, and *Good News Club*. All four restrict speech based on its religious purpose: WMATA prohibits speech that "promote[s] or oppose[s] any religion, religious practice or belief," while the Supreme Court cases involve restrictions barring speech "for religious purposes" (*Lamb's Chapel* and *Good News Club*) and speech that "promotes or manifests a particular belie[f] [including non-belief] in or about a deity or an ultimate reality" (*Rosenberger*). Such restrictions, the Supreme Court has held, amount to viewpoint discrimination when they bar speech on an otherwise-permissible subject. That's what WMATA's policy does. WMATA allows entities like Walmart to speak on the subjects of the perfect Christmas gift (toys) and how to spend the Christmas season (buying gifts and visiting stores at specified hours). And WMATA permits the Salvation Army to run ads encouraging people to donate to certain charities. The Archdiocese would also like to express its views on the perfect Christmas gift (Christ), how to spend the holiday (caring for the needy and visiting churches for Mass at specified hours), and whether to contribute to charities (yes, and particularly to religious charities). By barring the Archdiocese from doing so, WMATA's policy discriminates

against religious viewpoints no less than the restrictions in *Rosenberger*, *Lamb's Chapel*, and *Good News Club*.

I am not persuaded by the panel's efforts to distinguish these precedents. First, the panel emphasizes that the ad "is not primarily or recognizably about charitable giving, as it is not primarily or recognizably about opening hours or places to visit"; rather, it is "a religious ad, an exhortation, repeatedly acknowledged by the Archdiocese to be part of its evangelization effort to attend mass at Catholic churches in connection with Advent." *Archdiocese*, 897 F.3d at 329. The ad's imagery "is evocative not of the desirability of charitable giving, but rather the saving grace of Christ, which is not a subject included in the WMATA forum." *Id.* But the same could've been said in *Good News Club* and *Rosenberger*, where the restricted speech was "quintessentially religious" and "decidedly religious in nature" with an "evangelical message." *Good News Club*, 533 U.S. at 111-12 & n.4; *see Rosenberger*, 515 U.S. at 826. Even though the speech in those cases was primarily about religion, the Supreme Court rejected the restrictions for barring religious viewpoints on topics other than religion.[2]

---

[2] Other circuits read these Supreme Court cases in the same way. *See Grossbaum v. Indianapolis-Marion Cty. Bldg. Auth.*, 63 F.3d 581, 588, 590-92 (7th Cir. 1995) (based on *Rosenberger*, holding that a purported ban on the subject of religion violated the First Amendment by barring religious views on an "otherwise includible subject"—the "holiday season"—while allowing "non-religious" views); *see also Byrne v. Rutledge*, 623 F.3d 46, 56-57 (2d Cir. 2010) (based on *Rosenberger* and *Good News Club*, rejecting a "ban on religious messages" because it "operate[d] not to restrict speech to certain subjects but instead to distinguish between those who seek to express secular and religious views *on the same subjects*"); *Summum v. Callaghan*, 130 F.3d 906, 917-18 (10th Cir. 1997) ("In *Rosenberger*, the Court clarified the distinction between content-

The panel further attempts to distinguish the Supreme Court precedents as involving broader forums for "educational purposes" and "social, civic and recreational meetings." *Archdiocese*, 897 F.3d at 327. "By contrast, WMATA's forum—its advertising space on the exteriors of its buses—is not so broad, much less inviting through its advertisements public debate on religion." *Id.* But in any First Amendment forum, no matter its scope, viewpoint discrimination always violates the First Amendment. Limiting the scope of the forum does not make it more amenable to such discrimination. Nor must a forum serve broad "educational purposes" and "invite debate" in order to trigger constitutional protections from viewpoint discrimination. *Good News Club*, for example, involved a classroom in a public school that could be used by groups that had no intention to engage in debate among themselves or with others. *See* 533 U.S. at 103, 108.

In addition, the panel reads *Rosenberger* as affirming WMATA's view that it "retain[s] the prerogative to exclude religion as a subject matter." *Archdiocese*, 897 F.3d at 325. *Rosenberger*, the panel points out, suggested that the University policy might have been constitutional if it had "exclude[d] religion as a subject matter." *Id.* at 325-26 (quoting *Rosenberger*, 515 U.S. at 831). The panel opinion asks too much of this phrase, for the Supreme Court later explained, "[I]n *Rosenberger* there was no prohibition on religion as a subject matter, [but] our holding did not rely on this factor." *Good News Club*, 533 U.S. at 110. In any event, as already discussed, the University policy in *Rosenberger* and the

based and viewpoint discrimination and adopted a broad construction of the latter, providing greater protection to private religious speech on public property": Accordingly, if "the government permits secular displays on a nonpublic forum, it cannot ban displays discussing otherwise permissible topics from a religious perspective." (citation omitted)).

WMATA policy are indistinguishable, so both policies—by their "very terms"—"do[] not exclude religion as a subject matter." *Rosenberger*, 515 U.S. at 831. Therefore, even if the government could craft a different regulation that validly excludes all discussion on the subject of religion, WMATA did not do so here.

Finally, the panel fears that the Archdiocese's position "eviscerate[s] . . . the long-standing recognition that the government may limit a non-public forum to commercial advertising." *Archdiocese*, 897 F.3d at 329. That issue is not presented here, for WMATA permits both commercial and non-commercial ads. And the Archdiocese's position does not, as the panel states, "eviscerate the distinction between viewpoint-based and subject-based regulation on which the forum doctrine rests." *Id.* As I see it, this case does nothing more than present us with an issue already decided by the Supreme Court: whether the government can prohibit a religious viewpoint on subjects it allows others to discuss without restriction. Recognizing that the governmental entities in *Rosenberger*, *Lamb's Chapel*, *Good News Club*, and this case unlawfully restricted religious viewpoints says nothing about the government's general ability to impose subject-based restrictions.[3]

---

[3]    In the alternative, the Archdiocese argues that a categorical ban on the subject of religion would still violate the First Amendment because it is unreasonable for WMATA to prohibit all religious speech based on concerns like avoiding community discord. *See* Pet. for Reh'g En Banc 15-17; Appellant's Br. 26-30; *Mansky*, 138 S. Ct. at 1885. WMATA was concerned about the public response to ads on controversial issues, but as the Archdiocese points out, WMATA's policies separately address issue-oriented ads without any need for its ban on religious speech. *See* Appellant's Br. 28; *Am. Freedom Def. Initiative v. WMATA*, 901 F.3d 356, 373 (D.C. Cir. 2018). And although WMATA had "security concerns" about a

WMATA, like the University of Virginia and the New York school districts, violated the First Amendment by rejecting religious speech on otherwise-permissible subjects. I therefore respectfully dissent from the decision not to rehear this case en banc.

---

proposed ad depicting the Prophet Mohammed, as "some Muslims consider drawing the Prophet Mohammed so offensive that they have reacted violently . . . in the past," *Archdiocese*, 897 F.3d at 319-20, 330, the Archdiocese argues that WMATA could consider rejecting such an ad based on WMATA's other policies or on the ground that it could incite violence, *see* Appellant's Br. 28.

Relatedly, the Archdiocese argues that WMATA's ban violates the First Amendment by excluding religious speech simply because it is religious. *See id.* at 37-42; *Archdiocese*, 897 F.3d at 330-31. At oral argument, WMATA conceded that it could not ban speech promoting or opposing a *particular* religion. *See* Oral Arg. Tr. 34 (Mar. 26, 2018). Banning *all* religious speech may be equally unconstitutional. *See, e.g.*, *id.* at 34-35 (Judge Kavanaugh: "[H]ere's the problem which I see at the heart of this, which is it is believed that discriminating against all religions is okay, discriminating against individual religions [is] not okay, but the Supreme Court has said that's wrong, that to discriminate against Catholicism, Protestantism, Mormonism, Islam, Judaism as a class is discrimination against religion, and that[,] in the words of the Chief Justice last year for six Justices[,] is 'odious to our Constitution.'" (quoting *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2025 (2017))). Although the Archdiocese's alternative arguments are significant, I do not believe the en banc court needs to address them because *Lamb's Chapel*, *Rosenberger*, and *Good News Club* resolve this case.